1
2
3
4
5
6
7
8           IN THE UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JAMES L. OSTRANDER,

11            Plaintiff,                    No. 2:08-cv-02850 KJN

12        v.

13   MICHAEL J. ASTRUE,
     Commissioner of Social Security,
14
              Defendant.                    <u>ORDER</u>
15   _____/

16            Plaintiff seeks judicial review of a final decision of the Commissioner of Social

17   Security ("Commissioner") denying plaintiff's request for Disability Insurance Benefits under

18   Title II of the Social Security Act ("Act") and Supplemental Security Income under Title XVI of

19   the Act.[1]  Plaintiff contends that the Administrative Law Judge ("ALJ") erred by: (1) rejecting the

20   opinion of plaintiff's treating physician without a legitimate basis for doing so; (2) rejecting

21   plaintiff's testimony regarding his pain and functional limitations as not entirely credible without

22   a legitimate basis for doing so; and (3) failing to properly assess plaintiff's residual functional

23   capacity ("RFC") and thus posing a legally inadequate hypothetical question to the vocational

24
          [1]  This case was referred to the undersigned pursuant to Eastern District of California
25   Local Rule 302(c)(15) and 28 U.S.C. § 636(c), and both parties have voluntarily consented to
     proceed before a United States Magistrate Judge.  (Dkt. Nos. 7, 9.)  This case was reassigned to
26   the undersigned by an order entered February 9, 2010.  (Dkt. No. 24.)

1

expert.  (Dkt. No. 20.)  The Commissioner filed a cross-motion for summary judgment.  (Dkt. No. 23.)

For the reasons that follow, the court denies plaintiff's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment.

I.      BACKGROUND

A.      Procedural Background

On July 26, 2005, plaintiff filed an application for Disability Insurance Benefits. (Administrative Transcript ("AT") 145, 171.)  On July 27, 2005, plaintiff filed an application for Supplemental Security Income.  (AT 414, 171.)  In both applications plaintiff alleged a disability onset date of March 30, 2003.  (AT 194, 415.)  Following an initial denial of his claims, plaintiff filed a Request for Reconsideration which was subsequently denied on February 7, 2006.  (AT 224, 409, 185, 183, 177.)  Plaintiff timely filed a request for a hearing and the ALJ conducted hearings on March 22, 2007, September 12, 2007, November 14, 2007, and January 29, 2008. (AT 18, 40, 71, 106, 127.)  The ALJ heard testimony from plaintiff, medical expert David C. Richwerger, Ed. D., and vocational expert ("VE") Susan Creighton-Clavel.  (AT 40, 72, 106, 121.)

In a decision dated February 22, 2008, the ALJ denied plaintiff's applications, finding that plaintiff could return to his past work with some limitations in his residual functional capacity.[2]  (AT 23-24.)  The ALJ's decision became the final decision of the Commissioner when

_____

[2]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 et seq.  Generally speaking, Supplemental Security Income ("SSI") is paid to disabled persons with low income.  42 U.S.C. §§ 1382 et seq.  Under both benefit schemes, the term "disability" is defined, in part, as an "inability to engage in any substantial gainful activity" due to "any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920, 416.971-76; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Ninth Circuit Court of Appeals has summarized the sequential evaluation as follows:

the Appeals Council denied plaintiff's request for review on September 25, 2008.  (AT 5-7.)

Plaintiff seeks judicial review of the denial of his applications.

              B.     <u>Summary of Relevant Medical History and Evidence</u>

        At the time of his March 22, 2007 hearing before the ALJ, plaintiff was 29 years

old, and had not worked since March 30, 2003.  (AT 43-44.)  Plaintiff had completed high school

and had never received any specialized vocational training.  (AT 43, 398.)  He had worked at a

call center for an insurance company where his duties included answering phones and processing

changes to insurance policies.  (AT 44.)  Prior to that job, plaintiff worked as a supervisor for an

answering service call center, taking telephone orders for various products and services.  (AT 45-

46.)  Plaintiff also worked as a plumbing service dispatcher and for a fast food restaurant.  (AT

46-47.)  Plaintiff claims that he was fired from his last job for missing too much work due to

symptoms caused by back pain, anxiety, and irritable bowel syndrome ("IBS").  (AT 288, 290,

               Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

               Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

               Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

               Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

               Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

<u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

     The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  <u>Bowen</u>, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  <u>Id</u>.

1   398.)

2            Plaintiff first sought treatment on November 10, 1999, with Michael H. Robbins,

3   M.D. (AT 252.)  Plaintiff reported pain in his upper back and lower thoracic area, as well as pain

4   across his low back. (Id.)  Plaintiff described an area of numbness on the back part of his left

5   arm. (Id.)  However, Dr. Robbins noted that he was unable to detect radiculopathy[3] in that area

6   or into plaintiff's legs. (Id.)  Dr. Robbins reported that his examination revealed no deficits and

7   that plaintiff's problems were non-surgical. (Id.)

8            On December 20, 1999, Joe T. Hartzog, M.D. sent a letter to both Dr. Robbins

9   and Thomas I. Revesz, M.D. describing Dr. Hartzog's evaluation of plaintiff. (AT 377.)  Dr.

10  Hartzog wrote that he first saw plaintiff when plaintiff was 17 years old, and at that time plaintiff

11  presented complaining of one to two years of low back pain of variable character, intensity, and

12  location. (Id.)  Dr. Hartzog reported that at the time of plaintiff's first visit, plaintiff occasionally

13  had some numbness in his right leg that would extend to the knee. (Id.)  Dr. Hartzog reported

14  that plaintiff had treated with medication and that plaintiff had seen Laura Anderson, M.D., who

15  did not feel that plaintiff required surgery. (Id.)  Dr. Hartzog relayed that Dr. Anderson's opinion

16  was based on plaintiff's MRI scan which revealed minimal disc desiccation[4] of L4-5 and L5-S1

17  with a bright signal of the posterior annulus at L5-S1. (Id.)

18           Dr. Hartzog's evaluation revealed that plaintiff was neurologically intact and Dr.

19  Hartzog did not find any evidence of significant root tension signs. (Id.)  While plaintiff

20  demonstrated restricted range of motion in his back, Dr. Hartzog opined that the pain was

21

22

23

-------

24       [3] "Radiculopathy" is defined as a "disorder of the spinal nerve roots." Stedman's
    Medical Dictionary 1622 (Lippincott Williams & Wilkins, eds., 28th ed. 2006).

25

26       [4] Desiccate means "to dry thoroughly" or "to render free from moisture." Stedman's
    Medical Dictionary at 522.

discogenic[5] in nature and recommended physical therapy.  (Id.)  Dr. Hartzog reported that plaintiff's pain was made worse by bending, walking on hard floors, or by laying or sitting on hard surfaces for too long a period of time.  (Id.)  Dr. Hartzog reported that his impression was chronic pain syndrome, probably of discogenic origin.  (Id.)  While Dr. Hartzog recommended a repeat MRI scan of plaintiff's lumbar spine, he did not feel that plaintiff was a surgical candidate. (AT 379-80.)

Plaintiff's January 12, 2000 MRI scan revealed normal findings at levels L1-2, L2-3, L3-4, and L4-5.  (AT 376.)  The scan revealed a disc bulge at the L5-S1 level with a very small left paracentral protrusion without root compression.  (Id.)  The interpreting doctor concluded that plaintiff showed mild degenerative changes in his lower lumbar spine without canal stenosis[6] or root compression.  (Id.)

On March 14, 2002, plaintiff presented to Dr. Revesz with symptoms of IBS for which plaintiff was prescribed a drug called Lonox.  (AT 374.)

On December 17, 2002, plaintiff presented to Dr. Revesz and was given an injection of Ketorolac.[7]  (AT 373.)  It is unclear from the record what symptoms this injection was intended to treat.  (Id.)  This procedure was performed again on February 3, 2003.  (Id.)

On March 13, 2003, plaintiff returned to Dr. Revesz's office complaining of IBS

---

[5]  Discogenic means "denoting a disorder originating in or from an intervertebral disc." Stedman's Medical Dictionary at 550.

[6]  Lumbar spinal stenosis is the "narrowing of the lumbar spinal canal, which produces pressure on the sciatic nerve roots (or sometimes the cord) before their exit from the foramina, causing positional back pain and symptoms of nerve root compression."  Mark H. Beers, M.D., et al., eds., The Merck Manual of Diagnosis and Therapy 328 (Merck Research Laboratories, 18th ed. 2006) ("Merck Manual").

[7]  Plaintiff's treatment records indicate that he was administered Toradol, which is the brand name for Ketorolac Tromethamine.  Toradol is "a nonsteroidal anti-inflammatory drug (NSAID), is indicated for the short-term (up to 5 days in adults) management of moderately severe acute pain that requires analgesia at the opioid level."  Physicians' Desk Reference, (Thomson PDR, 59th ed. 2005), available at 2005 WL 4062156.

1    and increased lower back pain.  (Id.)  Plaintiff reported tingling and numbness in his lower left

2    extremities, and Dr. Revesz noted that plaintiff had decreased range of motion.  (Id.)  Plaintiff

3    was again given Ketorolac.  (Id.)

4           On May 5, 2003, plaintiff presented to Dr. Revesz complaining of back pain and

5    left knee pain brought on by exercise.  (Id.)  Dr. Revesz theorized that the knee pain was caused

6    by tendinitis and plaintiff was prescribed rest, heat, and ACE bandage support.  (Id.)

7           On July 22, 2003, plaintiff presented to Dr. Revesz to follow-up on plaintiff's left

8    knee pain and back pain and complained that his "IBS [is] going crazy."  (AT 369.)  Dr. Revesz

9    noted that plaintiff visited on May 20th for an injury he suffered after going up and down the

10   stairs.  (Id.)  Plaintiff reported that his left knee was getting better and that while he continued to

11   have IBS symptoms, he felt that Lonox helped and would like to be prescribed more.  (Id.)

12   Plaintiff was also given an injection of Toradol and was prescribed Vicodin.  (Id.)

13          On September 15, 2003, plaintiff again met with Dr. Revesz regarding pain in his

14   lower back.  (AT 364.)  Plaintiff returned to Dr. Revesz on November 25, 2003, complaining of

15   "back and knee pain."  (AT 360.)  Dr. Revesz ordered imaging scans of plaintiff's knee, sacrum,

16   and lumbar spine.  (AT 360, 358.)  With regard to plaintiff's sacrum, Dr. Revesz's referral slip

17   described plaintiff's history as "fell down stairs on rearend."  (AT 358.)  With regard to the MRI

18   scans of plaintiff's left knee and lumbosacral region respectively, Dr. Revesz described plaintiff's

19   history as "chronic pain since approx[imately] 1999."  (AT 359.)

20          A January 12, 2004, MRI scan of plaintiff's left knee revealed an impression of a

21   discoid lateral meniscus with Grade II/III mucoid degeneration with the most severe involving

22   the posterior horn.  (AT 356.)  The interpreting doctor also reported an unremarkable medial

23   meniscus and an intact cruciate and collateral ligament.  (Id.)  Plaintiff's lumbar MRI scan

24   revealed low grade degenerative disc disease at L4-L5 and L5-S1 with posterior bulge annuli, but

25   no evidence of focal disc protrusion.  (AT 357.)  The scan also revealed a minimally displaced

26   fracture of the proximal coccyx.  (Id.)

1    Plaintiff presented to Dr. Revesz on January 19, 2004, and was administered an

2    injection of Ketorolac.  (AT 353.)  Plaintiff was again prescribed Vicodin.  (Id.)

3    On February 18, 2004, plaintiff presented to Paul M. Sasaura, M.D. complaining

4    of left knee pain since April of the previous year.  (AT 348.)  Dr. Sasaura noted that plaintiff had

5    been doing a lot of moving at the onset of his knee pain and that heat and ACE brace treatment

6    had not alleviated his symptoms.  (Id.)  Dr. Sasaura's physical examination of plaintiff revealed

7    pain during range of motion testing.  (AT 349.)  Dr. Sasaura's impression paralleled the MRI

8    scan findings and, based on plaintiff's symptoms, Dr. Sasaura recommended arthroscopy and

9    partial meniscectomy.  (Id.)

10   Surgical records pertaining to plaintiff's left knee are not part of the record.

11   However, plaintiff's March 18, 2004 post-operative follow-up with Dr. Sasaura reported that

12   while plaintiff was still in considerable pain, his symptoms were resolving.  (AT 346.)  On March

13   26, 2004, ultrasound imaging revealed no evidence of deep vein thrombosis.  (AT 287.)

14   On May 10, 2004, plaintiff presented to Dr. Sasaura complaining of significant

15   pain in his left knee.  (AT 343.)  Dr. Sasaura reported that plaintiff was hypersensitive during

16   range of motion testing and concluded his pain symptoms "may be a type of RSD."[8]  (Id.)

17   On October 27, 2004, plaintiff presented to Dr. Revesz complaining of sciatica[9]

18   flare-up brought on by car and air travel.  (AT 337.)  Plaintiff described the pain as 9/10 with

19   symptoms traveling down both legs.  (Id.)  Dr. Revesz noted that all aspects of plaintiff's range

20   of motion were limited with respect to his back.  (Id.)  Plaintiff was given a Toradol injection, a

21   prescription for Vicodin, and was referred to Craig N. Pfeiffer, M.D., a neurosurgeon.  (Id.)

22

---

23   [8]  Reflex Sympathetic Dystrophy, also known as Complex Regional Pain Syndrome is
     "chronic neuropathic pain that follows soft tissue or bone injury (type I) or nerve injury (type II)
24   and persists out of proportion in intensity and duration to the original tissue damage."  Merck
     Manual at 1780.
25
     [9]  Sciatica is "pain along the sciatic nerve.  It usually results from compression of nerve
26   roots in the lower back."  Merck Manual at 327.

1      On November 8, 2004, plaintiff presented to Dr. Revesz complaining of moderate

2  distress due to chronic back pain.  (AT 336.)  Plaintiff was given a Toradol injection and his

3  Vicodin prescription was refilled.  (Id.)

4      On November, 22, 2004, Dr. Pfeiffer conducted a neurological consultation with

5  plaintiff.  (AT 250.)  Dr. Pfeiffer described plaintiff's clinical history as having diffuse low back

6  pain since age 17, with radiation into his legs.  (Id.)  Plaintiff explained that sitting for long

7  periods of time was uncomfortable and that he was bothered by pain even while lying down.

8  (Id.)  Dr. Pfeiffer reported that plaintiff previously had two epidural injections, physical therapy,

9  and TENS[10] unit therapy  (Id.)  Dr. Pfeiffer wrote that plaintiff's only injury occurred the

10  previous January when he fell down the stairs and fractured his coccyx, from which he had fully

11  recovered.  (Id.)  Dr. Pfeiffer found that plaintiff walked stiffly and complained of pain in his

12  right and left lumbosacral regions.  (Id.)  Plaintiff's extension was zero degrees while his flexion

13  was "only 60 degrees due to back pain."  (Id.)  Dr. Pfeiffer reported that performing "toe walk"

14  caused plaintiff radiating right leg pain.  (Id.)  Dr. Pfeiffer examined plaintiff's MRI scan and

15  noted moderate degeneration of the lumbar spine at L4-5 and L5-S1 and a coccyx fracture.  (Id.)

16  Dr. Pfeiffer reported that plaintiff's imaging scan did not explain his chronic pain.  (Id.)  Dr.

17  Pfeiffer diagnosed plaintiff with chronic low back pain which he described as "genuine," but "so

18  far unexplained."  (Id.)  Dr. Pfeiffer declared that he saw no role for neurosurgery in plaintiff's

19  treatment course regardless of etiology.  (Id.)

20      Dr. Pfeiffer referred plaintiff for an isotope scan on December 9, 2004.  (AT 334.)

21  A whole body bone scan and a SPECT[11] scan of the lumbar spine revealed no abnormalities.

22  (Id.)

23

24      [10]  TENS is an abbreviation for "transcutaneous electrical nerve stimulation."  Stedman's
Medical Dictionary at 1946.

25

26      [11]  SPECT is an acronym for "single photon emission computed tomography."  Stedman's
Medical Dictionary at 1796.

1          On February 16, 2005, plaintiff received a repeat lumbar epidural steroid injection

2   at Mercy General Hospital.  (AT 276.)  Plaintiff described his pain as constant and throbbing,

3   usually starting in the mid lower back, radiating downward bilaterally to his legs.  (Id.)  Plaintiff

4   denied significant numbness but complained of occasional slight numbness, usually around the

5   big toe area.  (Id.)

6          On March 10, 2005, plaintiff returned to Mercy General Hospital for another

7   lumbar epidural injection.  (AT 265.)  Plaintiff complained that the last injection provided no

8   relief and he was still suffering from constant pain starting at his mid lower back.  (Id.)

9          On April 11, 2005, Dr. Revesz evaluated plaintiff's ability to work and declared

10  that plaintiff was unable to sit, stand, walk, or reach overhead.  (AT 320.)  Dr. Revesz further

11  reported that plaintiff was unable to bend, squat, climb, or crawl.  (Id.)  He declared that plaintiff

12  was unable to lift any weight up to his waist, or over his head.  (Id.)  Dr. Revesz also stated that

13  due to his back pain, plaintiff was unable to use his hands for repeated grasping, pulling, pushing,

14  twisting, or fine manipulation motions.  (Id.)  Dr. Revesz reported that while plaintiff was able to

15  use both feet for repeated motions, including driving automotive equipment, plaintiff was

16  physically unable to work around dangerous machinery, unable to work at heights, unable to

17  work exposed to dust, lint, or fumes, unable to work outside year round, or unable to work in

18  confined spaces.  (AT 321.)  Dr. Revesz declared that plaintiff's limitations were permanent and

19  prohibited him from all work.  (Id.)  With regard to plaintiff's mental state, Dr. Revesz declared

20  that plaintiff was alert and that he did not recommend plaintiff be referred to mental health

21  services.  (Id.)

22         On April 19, 2005, plaintiff returned to Mercy General Hospital for another

23  epidural steroid injection in his lumbar spine.  (AT 255.)  Plaintiff also received a bilateral L4 to

24  L5 lumbar somatic nerve block with lidocaine.  (AT 256.)  Plaintiff's reported symptoms were

25  chronic low back pain with bilateral leg pain and tingling sensation.  (AT 255.)  Plaintiff

26  complained that his symptoms were as intense as at the past visit and that his prior epidural

1  injection provided only very minimal benefit.  (Id.)  Gerald Choi, D.O. noted in his report that

2  plaintiff was still hurting despite a series of three injections one month apart.  (AT 257.)  Dr.

3  Choi was not sure if plaintiff would get any relief from a repeat injection.  (Id.)

4          On August 30, 2005, a Consultation Request was submitted to the Disability

5  Determination Service to ascertain plaintiff's level of functionality.  (AT 288, 290.)  Plaintiff

6  alleged that he suffered from chronic back pain and IBS.  (AT 288.)  The report concluded that

7  plaintiff appeared to be capable of at least light duty work but sought more objective data.  (AT

8  289.)  Plaintiff's credibility was listed as "[p]artial (Severity not supported)."  (Id.)  It was also

9  noted that an initial review of plaintiff's medical records revealed nothing pertaining to plaintiff's

10  IBS.  (Id.)  In a second Consultation Request dated October 14, 2005, Corazon C. David, M.D.

11  wrote that there was still nothing in the records pertaining to plaintiff's IBS.  (AT 291.)

12          On that same day, Dr. David completed a report containing plaintiff's physical

13  residual functional capacity assessment.  (AT 301.)  He found that plaintiff could occasionally lift

14  and/or carry 20 pounds, could frequently lift and/or carry 10 pounds, could stand and/or walk

15  about 6 hours in an 8-hour workday, could sit with normal breaks for about 6 hours of an 8-hour

16  workday, and could push and/or pull unrestricted except by his ability to lift and/or carry.  (AT

17  302.)

18          Dr. David reported that plaintiff would have postural limitations due to his

19  injuries.  (AT 303.)  Specifically, he noted that plaintiff would frequently have limitations

20  climbing ramps or stairs, and balancing.  (Id.)  Dr. David declared that plaintiff would

21  occasionally have limitations climbing ladders, ropes, or scaffolds, and would have occasional

22  limitations stooping, kneeling, crouching, or crawling.  (Id.)  He reported that plaintiff had no

23  manipulative or visual limitations.  (AT 304.)  Dr. David also reported that plaintiff had no

24  communicative or environmental limitations.  (AT 305.)  However, Dr. David made a hand-

25  written note questioning whether or not plaintiff's IBS symptoms required him to be within a

26  certain proximity to a restroom.  (Id.)

1    Finally, Dr. David concluded that the severity or duration of plaintiff's symptoms

2  were disproportionate to the expected severity or duration of plaintiff's claimed impairments

3  based on his review of plaintiff's medical evidence.  (AT 306.)

4    On December 19, 2005, plaintiff presented to Jay A. Hendrickson, M.D. for an

5  initial pain management consultation.  (AT 293.)  Dr. Hendrickson described plaintiff's chief

6  complaint as low back pain that began in 1995 and reported that plaintiff's pain interfered with

7  his ability to perform everyday activities.  (Id.)  Dr. Hendrickson reported that plaintiff's pain

8  was exacerbated by walking, standing, lifting, and sitting for long periods of time.  (Id.)  After

9  reviewing plaintiff's medical history, including plaintiff's imaging history, Dr. Hendrickson

10  concluded that plaintiff's pain pattern was greater than expected given his MRI pathology.  (AT

11  297.)  Dr. Hendrickson's diagnostic impressions included lumbar degenerative disc disease,

12  myofascial pain syndrome,[12] and multiple sclerosis ("MS").  (Id.)

13    On January 28, 2006, C. Richard Dann, M.D. completed a Request for Medical

14  Advice.  (AT 299.)  Dr. Dann wrote that further information would needed in order to "rule out"

15  the possibility of MS.  (Id.)  A subsequent Request for Medical Advice completed February 2,

16  2006, stated that there was no current evidence to support a finding of MS and, therefore, Dr.

17  David's initial RFC assessment was appropriate.  (AT 310.)  On that same day, Dr. Dann

18  declared that he reviewed all the evidence in the file and affirmed Dr. David's original

19  assessment as written.  (AT 308.)

20    On January 15, 2007, plaintiff presented to E. Michael Thelen, M.D., who

21  declared that plaintiff had diffuse muscle tender points which were consistent with fibromyalgia.

22  (AT 392.)  Dr. Thelen also wrote that although he was initially concerned that plaintiff's

23

24

_____

25   [12] Myofascial Pain Syndrome, also known as Fibromyalgia, is a "common nonarticular
disorder of unknown cause characterized by achy pain, tenderness, and stiffness of muscles, areas
26  of tendon insertions, and adjacent soft tissues."  Merck Manual at 321.

1  musculoskeletal pain could be related to ankylosing spondylitis[13], plaintiff's x-ray reports

2  contained no evidence to support such a conclusion.  (Id.)

3          On February 3, 2007, Dr. Revesz prepared a Complete Medical Report describing

4  both plaintiff's physical and mental functional limitations.  (AT 382-90, 392-96.)  He concluded

5  that plaintiff was unable to lift or carry any weight on a sustained basis.  (AT 383.)  Dr. Revesz

6  further concluded that plaintiff's impairment prohibited him from standing or walking for any

7  amount of time during an eight-hour workday, and that he could only sit for three hours during an

8  eight-hour workday.  (AT 384.)  He also concluded that plaintiff would be unable to sit, stand, or

9  walk for any amount of time without interruption.  (Id.)  Moreover, Dr. Revesz declared that

10  plaintiff would be required to take at least a ten minute break every hour.  (Id.)  Dr. Revesz

11  reported that plaintiff could occasionally use both his hands and feet despite his impairments.

12  (Id.)

13          Dr. Revesz also reported that plaintiff should avoid all exposure to heights,

14  moving machinery, and chemicals or fumes.  (AT 385.)  He stated that plaintiff must also avoid

15  even moderate exposure to noise, dust, temperature extremes, or vibrations.  (Id.)  Dr. Revesz

16  reported that plaintiff could never perform duties which included climbing, balancing, crouching,

17  kneeling, or crawling, and that plaintiff could only occasionally perform duties which included

18  stooping.  (AT 386.)  Finally, Dr. Revesz reported that plaintiff could never perform duties which

19  included pushing/pulling, but could frequently perform duties which included hearing, and could

20  occasionally perform duties that involve reaching, handling, and feeling.  (Id.)

21          In his Complete Medical Report pertaining to plaintiff's mental health, Dr. Revesz

22  declared that plaintiff's ability to adjust to a job would be poor in the following areas: (1) the

23  ability to follow work rules; (2) the ability to relate to co-workers; (3) the ability to deal with the

24

25      [13]  Ankylosing spondylitis "is a systemic disorder characterized by inflammation of the
    axial skeleton and large peripheral joints, nocturnal back pain, back stiffness, accentuated
26  kyphosis, constitutional symptoms, and anterior uveitis."  Merck Manual at 290.

12

public; (4) the use of judgement; (5) the ability to interact with supervisor(s); and (6) the ability to function independently.  (AT 394.)  Dr. Revesz reported that plaintiff had no ability to deal with work stress or to maintain attention or concentration.  (Id.)

Additionally, Dr. Revesz declared that plaintiff had a "poor" ability to understand, remember, and carry out complex job instructions.  (AT 395.)  He also stated that plaintiff had a "poor" ability to understand, remember, and carry out detailed, but not complex, job instructions.  (Id.)  Dr. Revesz stated that plaintiff had a "fair" ability to understand, remember, and carry out simple job instructions.  (Id.)  While Dr. Revesz indicated that plaintiff had a "fair" ability to maintain personal appearance, he had a "poor" ability to behave in an emotionally stable manner.  (Id.)  Finally, Dr. Revesz noted that plaintiff had no ability to relate predictably in social situations and to demonstrate reliability.  (Id.)

On March 2, 2007, Dr. Thelen wrote a letter reporting that plaintiff had been seen in his office and had been diagnosed with fibromyalgia and chronic fatigue syndrome.  (AT 391.)

On May 7, 2007, David C. Richwerger, Ed. D., a consulting psychologist, completed his report based on plaintiff's psychological evaluation.  (AT 397.)  Dr. Richwerger conducted a series of tests, reviewed plaintiff's medical records, and conducted an interview with plaintiff in order to assess plaintiff's mental ability to do work-related activities.  (AT 397-403.)

Dr. Richwerger's diagnostic impressions were as follows:[14]

| | |
|---|---|
| Axis I: | Panic Disorder without agoraphobia, by history given.  Adjustment disorder with anxiety and depression, moderate secondary to health concerns. |
| Axis II: | Histrionic Personality Traits. |
| Axis III: | As discussed. |
| Axis IV: | Health-related concerns. |
| Axis V: | GAF is not clear but is estimated to be 61 to 70 based on interview and cognitive test results. |

---

[14]  (AT 402.)

1    Based on plaintiff's responses to questions contained in the MMPI-II exam,[15] Dr.

2    Richwerger reported that plaintiff's results were not valid due to an extremely high score on the F

3    scale portion of the exam.  (AT 402.)  Dr. Richwerger reported that a high score on this portion

4    of the exam indicated that plaintiff was over-responding to the questions with the likely result

5    being that plaintiff was exaggerating his psychiatric and psychological issues.  (Id.)

6    Based on his findings, Dr. Richwerger declared that plaintiff's ability to

7    understand, remember, and carry out instructions was not affected by his mental impairment.

8    (AT 404.)  However, Dr. Richwerger stated that plaintiff's mental impairment did limit his

9    ability to interact appropriately with supervisors, co-workers, and the public, as well as respond

10   to changes in a routine work setting.  (AT 405.)  Specifically, plaintiff had moderate impairment

11   in his ability to respond appropriately to usual work situations and to changes in a routine work

12   setting.  (Id.)  Plaintiff's ability to interact appropriately with the public, supervisors, or co-

13   workers was only mildly impaired.  (Id.)

14   C.    Summary of Relevant Hearing Testimony

15   At the administrative hearing, plaintiff testified that he is able to dress himself,

16   feed himself, and maintain his daily appearance without assistance.  (See AT 49-51.)  He also

17   testified that while he suffered from severe anxiety and panic attacks since 2002 which made it

18   difficult for him to do anything, he had not sought treatment from any mental health

19   professionals.  (AT 62.)  At a subsequent hearing, plaintiff testified that he had been suffering

20   from increased pain in his hands, legs, and feet.  (AT 110.)  Plaintiff testified that the pain would

21   last for several hours and affected his ability to stand, walk, or to pick up small objects such as

22   pens or pencils.  (AT 112.)  Plaintiff further testified that his IBS required him to use a restroom

23   on short notice at least 15 times per day.  (AT 113.)  Finally, plaintiff testified that despite the

24   above-listed impairments, he continued to operate a motor vehicle.  (AT 117.)

25

26   [15]  MMPI is an abbreviation for "Minnesota Multiphasic Personality Inventory test."
Stedman's Medical Dictionary at 1217.

14

1    The VE testified that the hypothetical individual with the RFC posed by the ALJ

2 would be able to perform some of the past work performed by plaintiff.  (AT 132.)  Specifically,

3 the VE testified that the hypothetical individual would be able to work as an insurance

4 underwriter, a customer call center supervisor, and an unskilled cashier in a restaurant.  (<u>Id</u>.)  The

5 VE testified that the hypothetical individual would not be able to work as a cook.  (<u>Id</u>.)

6    D.    <u>Summary of the ALJ's Findings</u>

7    The ALJ conducted the required five-step evaluation and concluded that plaintiff

8 had not been disabled from March 30, 2003, through the date of the ALJ's decision.  (AT 30.)  At

9 step one, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since

10 March 30, 2003, the alleged date of onset.  (AT 21.)

11    At step two, the ALJ found that since March 30, 2003, plaintiff suffered from the

12 following severe impairments: degenerative disc disease of the lumbosacral spine, history of left

13 knee surgery, fibromyalgia, myofascial pain disorder, depression (or adjustment disorder), and

14 panic disorder.  (<u>Id</u>.)  The ALJ also found that: (1) plaintiff's IBS was not severe and was not

15 severe for any continuous 12 month period; (2) plaintiff's gastroesophageal reflux disease was

16 not severe and was not severe for any continuous 12 month period; (3) that there was no evidence

17 of severe impairment related to plaintiff's coccyx fracture which lasted 12 continuous months;

18 (4) that the record failed to establish that plaintiff had a medically determinable impairment of

19 chronic fatigue syndrome; and (5) that plaintiff did not have a medically determinable

20 impairment of MS.  (AT 21-22.)

21    At step three, the ALJ determined that plaintiff's impairments, whether alone or in

22 combination, did not meet or medically equal any impairment listed in the applicable regulations.

23 (AT 22-23.)

24    The ALJ further determined that plaintiff had the RFC to perform a limited range

25 of light work.  (AT 23.)  Specifically, the ALJ stated:

26    After careful consideration of the entire record, the undersigned finds that the

15

1  claimant has the residual functional capacity to perform a limited range of light
   work as defined in 20 CFR 404.1567(b) and 416.967(b).  Specifically; claimant
2  can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently.
   Can sit eight hours out of an eight-hour workday with normal breaks; and is
3  allowed to sit or stand at will, without leaving the workstation.  The claimant can
   stand/walk six hours out of an eight-hour workday with normal breaks.  He can
4  never climb ladders, ropes, or scaffolds.  The claimant can occasionally stoop,
   crouch or kneel.  He can never crawl . . .
5

6  At step four, the ALJ found that plaintiff was capable of performing his past work

7  as an insurance underwriter, customer service supervisor, and restaurant cashier because these

8  jobs are light or sedentary in nature and would allow for plaintiff to perform them within the

9  limitations of his established RFC.  (AT 29-30.)  Accordingly, the ALJ concluded that plaintiff

10 had not been under a disability, as defined in the Social Security Act, from March 30, 2003,

11 through the date of the ALJ's decision.  (AT 30.)

12 II.  <u>ISSUES PRESENTED</u>

13 Plaintiff contends that the ALJ committed three errors in denying his claim.  First,

14 plaintiff argues that the ALJ erred by rejecting the opinions of Dr. Revesz without a legitimate

15 basis for doing so.  Second, plaintiff contends that the ALJ improperly discounted plaintiff's

16 testimony regarding his pain and functional limitations as not entirely credible.  Finally, plaintiff

17 claims that because the ALJ improperly assessed plaintiff's RFC, the ALJ also erred by posing a

18 legally inadequate hypothetical question to the VE.

19 III.  <u>STANDARDS OF REVIEW</u>

20 The court reviews the Commissioner's decision to determine whether it is: (1) free

21 of legal error, and (2) supported substantial evidence in the record as a whole.  <u>Bruce v. Astrue</u>,

22 557 F.3d 1113, 1115 (9th Cir. 2009).  This standard of review has been described as "highly

23 deferential."  <u>Valentine v. Comm'r of Soc. Sec. Admin.</u>, 574 F.3d 685, 690 (9th Cir. 2009).

24 "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such

25 relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Bray</u>

26 <u>v. Comm'r of Soc. Sec. Admin.</u>, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting <u>Andrews v.</u>

1   Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).  "The ALJ is responsible for determining

2   credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  Andrews,

3   53 F.3d at 1039.

4          Findings of fact that are supported by substantial evidence are conclusive.  42

5   U.S.C. § 405(g); see also McCarthy v. Apfel, 221 F.3d 1119, 1125 (9th Cir. 2000).  "Where the

6   evidence as a whole can support either a grant or a denial, [the court] may not substitute [its]

7   judgment for the ALJ's."  Bray, 554 F.3d at 1222 (citing Massachi v. Astrue, 486 F.3d 1149,

8   1152 (9th Cir. 2007)); see also Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir.

9   2008) ("'Where evidence is susceptible to more than one rational interpretation,' the ALJ's

10  decision should be upheld.") (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).

11  However, the court "must consider the entire record as a whole and may not affirm simply by

12  isolating a 'specific quantum of supporting evidence.'"  Ryan, 528 F.3d at 1198 (quoting

13  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)); accord Lingenfelter v. Astrue,

14  504 F.3d 1028, 1035 (9th Cir. 2007).

15  IV.   ANALYSIS

16         A.    The ALJ Provided Legally Sufficient Reasons for Rejecting the Medical
                 Opinions of Plaintiff's Treating Physician
17

18         Plaintiff's primary contention is that the ALJ erred by rejecting the opinions of his

19  treating physician, Dr. Revesz, without a legitimate basis for doing so.  (Pl.'s Mot. for Summ. J.

20  at 23.)  The Commissioner argues that the ALJ properly rejected Dr. Revesz's opinion by setting

21  forth specific and legitimate reasons for doing so that are supported by substantial evidence in the

22  record.  (Def.'s Opp. & Cross-Motion for Summ. J. at 9.)

23         The Ninth Circuit recognizes the medical opinions of three types of medical

24  sources in social security cases: "(1) those who treat the claimant (treating physicians); (2) those

25  who examine but do not treat the claimant (examining physicians); and (3) those who neither

26  examine nor treat the claimant (nonexamining physicians)."  Lester, 81 F.3d at 830.  The general

1  rule is that a treating physician's opinion is given more weight than that of a non-treating

2  physician.  <u>Id</u>.  However, the treating physician's medical opinions are not necessarily conclusive

3  as to plaintiff's physical impairments or to the ultimate issue of plaintiff's disability.  <u>Thomas v.</u>

4  <u>Barnhart</u>, 278 F.3d 947, 956 (9th Cir. 2002).  "Although the treating physician's opinion is given

5  deference, the ALJ may reject the opinion of a treating physician in favor of a conflicting opinion

6  of an examining physician if the ALJ makes findings setting forth specific, legitimate reasons for

7  doing so that are based on substantial evidence in the record."  <u>Id</u>. at 957.  "The ALJ can meet

8  this burden by setting out a detailed and thorough summary of the facts and conflicting clinical

9  evidence, stating his interpretation thereof, and making findings."  <u>Id</u>.  The opinions of a non-

10  treating physician may also constitute substantial evidence when the opinions are consistent with

11  independent clinical findings or other evidence in the record.  <u>Id</u>.  The ALJ may "disregard the

12  treating physician's opinion whether or not that opinion is contradicted."  <u>Batson v. Comm'r of</u>

13  <u>Soc. Sec. Admin.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004).

14          Here, Dr. Revesz served as plaintiff's treating physician.  (AT 22.)  Accordingly,

15  the ALJ had a duty to articulate specific and legitimate reasons for rejecting Dr. Revesz's

16  opinions.  As noted above, Dr. Revesz's medical opinions regarding plaintiff's physical and

17  mental functional limitations were contradicted by other medical opinions within the record.

18  (<u>See</u> AT 320-21, 382-86, 301-08, 397-406.)  Broadly stated, the ALJ found that Dr. Revesz's

19  assessment of plaintiff's limitations should be rejected because "they are extreme and not

20  supported by Dr. Revesz [*sic*] own treatment records or objective findings in other evidence of

21  record."  (AT 28.)  The ALJ wrote that "Dr. Revesz's records do not support his summary

22  conclusions."  <u>Id</u>.

23          Reviewing the ALJ's analysis, the court finds that the ALJ provided specific and

24  legitimate reasons for rejecting the Dr Revesz's opinions.  After reviewing plaintiff's medical

25  records, the ALJ set out a detailed and thorough summary of the relevant evidence.  He

26  recognized a disagreement between Dr. Revesz and the RFC assessed by Dr. David.  (<u>Id</u>.)

18

1    Moreover, the ALJ cited specific examples in the record as support for his decision to reject Dr.

2    Revesz's opinions.

3              The ALJ articulated specific and legitimate reasons for rejecting Dr. Revesz's

4    opinions by noting that plaintiff's treatment records failed to report severe fatigue symptoms or

5    upper extremity complaints that would tend to support plaintiff's assessed functional limitations.

6    (Id.)  When confronted with conflicting medical opinions, an ALJ need not accept a treating

7    physician's opinions that are conclusory, brief, and unsupported by the record as a whole, or by

8    objective medical findings.  Batson, 359 F.3d at 1195; Tonapetyan v. Halter, 242 F.3d 1144,

9    1149 (9th Cir. 2001).  Dr. Revesz's April 11, 2005 work limitations assessment stated that

10   plaintiff was unable to "reach overhead" or use either hand for "grasping, pulling, pushing,

11   twisting, [or] fine manipulation motions."  (AT 320.)  However, plaintiff's medical records

12   contain no evidence of upper extremity complaints which would substantiate Dr. Revesz's

13   assessment.  A review of the record reveals only two occasions on which the plaintiff complained

14   of upper extremity symptoms.  First, on November 10, 1999, Dr. Robbins reported that plaintiff

15   "described an area of numbness on the back part of his left arm but I do not pick up any radicular

16   signs here either."  (AT 252.)  Second, on December 20, 1999, Dr. Hartzog noted that plaintiff

17   described "occasional tingling in the left posterior arm near the biceps."  (AT 378.)  Neither

18   complaint is consistent with Dr. Revesz's assessment of plaintiff's upper extremity impairments.

19             The ALJ also properly discounted Dr. Revesz's opinion that plaintiff suffered

20   from chronic fatigue syndrome on the ground that Dr. Revesz's diagnosis was conclusory.  Dr.

21   Revesz's February 3, 2007 report lists a finding of "fatigue" without any attached clinical support

22   or a discussion of plaintiff's symptoms.  (AT 382.)  The ALJ's position is bolstered by Dr.

23   Thelen's subsequent letter, which simply states that "[plaintiff] also has a concurrent diagnosis of

24   chronic fatigue syndrome."  (AT 391.)

25             The ALJ also properly rejected Dr. Revesz's opinions by noting that the clinical

26   findings failed to show motor loss, weakness, neurological changes, or atrophy to warrant Dr.

1   Revesz's extreme limitations in walking, standing, sitting, or lifting.  (AT 29.)  Again, a review

2   of the record reveals that Dr. Revesz's opinions with regard to plaintiff's physical limitations

3   were conclusory and without clinical support.  The ALJ pointed to specific evidence in the record

4   which failed to substantiate the limitations assessed by Dr. Revesz.  (See AT 382-90.)  Based on

5   the limited discussion of plaintiff's upper extremity and fatigue complaints contained in the

6   record, the ALJ did not err in rejecting Dr. Revesz's opinion with regard to those limitations.

7          The ALJ also properly rejected Dr. Revesz's opinion with regard to plaintiff's

8   mental functioning.  The ALJ stated specific and legitimate reasons for rejecting Dr. Revesz's

9   assessment that plaintiff is virtually unable to function within a work environment based on

10  plaintiff's supposed mental impairment.  (AT 29, 393-96.)  The record contains evidence that

11  plaintiff complained of mental health impairment as early as February 18, 2004.  (See AT 348

12  (Dr. Sasaura's report listed "panic disorder" as part of plaintiff's past medical history).)

13  Procedure notes from Mercy General Hospital dated February 16, 2005, and March 10, 2005,

14  report that plaintiff's past medical history included a "panic disorder."  (AT 265, 276.)  However,

15  there is no medical evidence in the record to support the proposition that plaintiff's mental health

16  problems impaired him to the degree described by Dr. Revesz.  (AT 393-96.)  In fact, Dr.

17  Richwerger's report found that plaintiff was likely exaggerating his symptoms.  (AT 402.)

18  Moreover, despite claiming a long history of mental health impairments, the ALJ properly noted

19  that plaintiff's medical records reveal no referrals to mental health professionals.  (AT 29.)  By

20  pointing to specific facts in the record pertaining to plaintiff's treatment history, the ALJ properly

21  rejected Dr. Revesz's opinions regarding plaintiff's mental health limitations.

22          Finally, plaintiff argues that because his chronic pain and other symptoms are

23  consistent with symptoms associated with fibromyalgia, the ALJ erred by rejecting Dr. Revesz's

24  opinions.  (Pl.'s Mot. for Summ. J. at 25.)  Plaintiff was diagnosed with fibromyalgia by Dr.

25  Revesz in early 2007.  (AT 393.)  This diagnosis was affirmed by Dr. Thelen on March 2, 2007.

26  (AT 391.)  The ALJ agreed with this diagnosis, listing fibromyalgia as one of plaintiff's "severe

20

1    impairments." (AT 21.)  The ALJ wrote that "Dr. Thelen was apparently treating the claimant

2    for fibromyalgia, which is documented by tender points."  (Id.)  However, as discussed above, the

3    ALJ properly rejected the opinions of Dr. Revesz regarding functional limitations based on

4    substantial evidence in the record.  Moreover, the plaintiff has not met the burden of proof to

5    show that his fibromyalgia was disabling.  See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir.

6    1993) (holding that the mere existence of an impairment is insufficient proof of a disability and

7    that plaintiff bears the burden of proving that an impairment is disabling).  Because the ALJ's

8    finding is a rational interpretation of the evidence, he did not err by rejecting Dr. Revesz's

9    opinions.  See Tommasetti v. Astrue, 533 F.3d 1035, 1041-42 (9th Cir. 2008) (holding that "the

10   ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence") (citations

11   and internal quotation marks omitted).

12                    B.      The ALJ Did Not Err by Rejecting Plaintiff's Testimony Regarding His
                             Pain and Functional Limitations

13

14            Plaintiff argues that the ALJ erred by improperly rejecting plaintiff's testimony

15   regarding the severity of his pain and symptoms.  Plaintiff makes three specific arguments, which

16   are addressed in turn below.  First, plaintiff argues that the ALJ erred by failing to fully credit

17   plaintiff's testimony regarding his pain and functionality levels.  (Pl.'s Mot. for Summ. J. at 29.)

18   Second, plaintiff argues that the ALJ erred by not fully crediting plaintiff's testimony regarding

19   his limitations in handling, grasping, and manipulating objects.  (Pl.'s Mot. for Summ. J. at 30.)

20   Finally, plaintiff argues that the ALJ erred by not fully crediting plaintiff's testimony regarding

21   his IBS symptoms.  (Id.)

22            In order to determine whether plaintiff's testimony regarding his subjective pain

23   or symptoms is credible, an ALJ must engage in a two-step analysis.  First, the ALJ must

24   determine whether plaintiff has "presented objective medical evidence of an underlying

25   impairment which could reasonably be expected to produce the pain or other symptoms alleged."

26   Lingenfelter, 504 F.3d at 1036 (citations and internal quotation marks omitted).  Second, if there

                                                    21

1    is objective medical evidence of an impairment, the ALJ then may consider the nature of the

2    symptoms alleged, including aggravating factors, medication, treatment and functional

3    restrictions.  Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc).  An ALJ may not

4    reject a claimant's subjective complaints based solely on a lack of medical evidence which fully

5    corroborates the alleged severity of pain, but may engage in the "ordinary techniques" of

6    credibility evaluation.  Burch, 400 F.3d at 680 (citations omitted).  In determining credibility, an

7    ALJ may consider, among other things: (1) the applicant's reputation for truthfulness, prior

8    inconsistent statements or other inconsistent testimony, (2) unexplained or inadequately

9    explained failure to seek treatment or to follow a prescribed course of treatment, and (3) the

10   applicant's daily activities.  Orn v. Astrue, 495 F.3d 625, 636 (9th Cir. 2007); Smolen v. Chater,

11   80 F.3d 1273, 1284 (9th Cir. 1996).

12        If there is no evidence of malingering, the ALJ may reject the plaintiff's testimony

13   regarding the severity of his symptoms only by offering specific, clear and convincing reasons for

14   doing so.[16]  Lingenfelter, 504 F.3d at 1036.  An ALJ accomplishes this task by pointing to

15   specific facts in the record which demonstrate that a plaintiff's pain or symptoms are less severe

16   than he or she claims.  Vasquez v. Astrue, 547 F.3d 1101, 1105 (9th Cir. 2008).

17        First, plaintiff contends that the ALJ erred by failing to credit plaintiff's testimony

18   regarding his fibromyalgia-related symptoms.  Plaintiff claims that because a lack of objective

19   medical evidence is not inconsistent with a fibromyalgia diagnosis, the ALJ improperly rejected

20   plaintiff's testimony regarding his pain level and functional limitations.  (Pl.'s Mot. for Summ. J.

21   at 30.)  At step one of the credibility analysis, the ALJ found that plaintiff had presented

22   sufficient objective medical evidence of his impairment.  The ALJ wrote that he "credited some

23   standing, walking and sitting limitations due to history of knee surgery, fibromyalgia, and

24

25        [16]  Despite Dr. Richwerger's report and testimony which indicated that plaintiff was likely exaggerating his mental heath impairments, the ALJ did not specifically rely on evidence of malingering in discounting plaintiff's testimony.  As such, the undersigned will review the ALJ's

26   opinion under the clear and convincing standard articulated in Lingenfelter.

1   degenerative disc disease." (AT 28.)

2         At step two, the ALJ offered clear and convincing reasons for rejecting plaintiff's

3   testimony. Broadly stated, the ALJ pointed to specific facts contained in plaintiff's medical

4   records and testimony which tended to demonstrate that plaintiff's symptoms were less severe

5   than he claimed. The ALJ noted that while plaintiff had periods of pain exacerbations, he was

6   generally stable on medication in between these episodes and had gone long periods of time

7   without treatment. (AT 28.) The record contains no evidence that plaintiff sought medical

8   treatment between December 19, 2005, and January 15, 2007. (AT 26; see also AT 293-98, 392.)

9         In addition, the ALJ noted that the medical records pertaining to plaintiff's

10   fibromyalgia do not contain objective findings consistent with the severity alleged in plaintiff's

11   testimony. (AT 28.) Plaintiff testified that it was difficult for him to bend over and that he

12   experienced "stabbing" pain when he touched something. (AT 50.) However, plaintiff testified

13   that he was able to bathe himself, feed himself, dress himself, and operate a motor vehicle. (AT

14   49, 50, 52.) Dr. Thelen's treatment note reports "diffuse tender points" and that "fibromyalgia

15   seems most likely." (AT 392.) However, neither the January 15, 2007 report, nor the March 2,

16   2007 addendum discuss severe symptoms consistent with Dr. Revesz's RFC or plaintiff's

17   testimony. (AT 392, 382-86, 391, 49-52, 109-13.) Accordingly, the ALJ did not err by failing to

18   credit plaintiff's testimony regarding the severity of his pain or functional limitations.

19         The ALJ also did not err by failing to fully credit plaintiff's testimony regarding

20   his upper extremity limitations, which were not fully supported by the record. While plaintiff is

21   correct that the record contains two instances of upper extremity complaints,[17] these two entries

22   are not sufficient to overcome the clear and convincing reasons stated by the ALJ. On March 22,

23   2007, plaintiff testified that his upper extremity pain made it feel like he had "needles" in his

24   hands and that it was sometimes impossible to operate zippers. (AT 50.) At a later hearing,

25

26       [17] (See AT 252, 378.)

1   plaintiff testified that he had "almost constant" pain in his hands which made it difficult to

2   pickup or use small items.  (AT 111-112.)  He further testified that when the pain occurred, it

3   was between a 7 and 8 on a scale of 10.  (AT 112.)

4          The ALJ properly rejected plaintiff's testimony.  First, the ALJ reviewed the

5   record in detail and noted that plaintiff failed to seek treatment for upper extremity complaints.

6   (AT 28.)  Second, the ALJ noted that the record is devoid of evidence linking fibromyalgia or

7   any other potential impairment to the level of pain or symptoms that plaintiff describes in his

8   testimony.  (AT 391, 392, 49-52, 109-13.)  Third, the ALJ noted that while plaintiff complained

9   of extreme pain that rendered him unable to use his hands, he continued to operate a motor

10  vehicle.  (AT 117-18.)  Because the ALJ pointed to specific facts in the record which tended to

11  show that plaintiff's symptoms were not as severe as his subjective complaints, the ALJ did not

12  err by failing to fully credit plaintiff's testimony regarding his upper extremity limitations.

13         Finally, the ALJ did not err by failing to credit plaintiff's testimony regarding his

14  IBS.  Plaintiff testified that he needed to use the restroom on short notice approximately 15 times

15  per day.  (AT 115.)  The ALJ properly rejected this testimony by pointing to clear and convincing

16  evidence in the record which demonstrated that plaintiff's symptoms were less severe than he

17  claimed.  The ALJ cited a 2003 treatment note which reported that regarding plaintiff's IBS

18  symptoms, plaintiff "[f]eels lonox helps and would like more."  (AT 369.)  See Warre v.

19  Commissioner of Social Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ( "Impairments that

20  can be controlled effectively with medication are not disabling for the purpose of determining

21  eligibility for SSI benefits").  Further, the ALJ properly concluded that plaintiff's treatment

22  records failed to contain allegations that his IBS symptoms required anything more than "routine

23  treatment."  (AT 21.)  As the ALJ noted, plaintiff did not seek more extensive treatment or

24  diagnostic testing.  (Id.)  Accordingly, the ALJ did not err by failing to credit plaintiff's testimony

25  regarding his IBS.

26  ////

1        C.      The ALJ's RFC and Hypothetical to the VE Were Proper

2                In a variation on the arguments raised above, plaintiff contends that the ALJ erred

3    in assessing plaintiff's RFC and, as a result, the ALJ posed improper hypothetical questions to

4    the VE based on this RFC.  (Pl.'s Mot. for Summ. J. at 31-32.)  However, plaintiff's challenge to

5    the propriety of the ALJ's hypothetical is simply an attempt to revisit the arguments addressed

6    above, and plaintiff alleges no specific error with respect to the ALJ's exchange with the VE.

7    (Pl.'s Mot. for Summ. J. at 32. ("In reaching this RFC determination, the ALJ rejected the

8    treating opinions of Dr. Revesz as well as Mr. Ostrander's testimony").)

9                Because the ALJ properly rejected Dr. Revesz's opinions and plaintiff's

10   testimony, the ALJ did not err in assessing plaintiff's RFC.  "It is clear that it is the responsibility

11   of the ALJ, not the claimant's physician, to determine residual functional capacity."  Vertigan v.

12   Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (citing 20 C.F.R. § 404.1545).  Plaintiff correctly

13   points out that the assumptions made in the hypothetical must be supported by the record.

14   Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  However, when posing hypotheticals to a

15   VE, the ALJ must only include those limitations supported by substantial evidence.  Robbins,

16   466 F.3d at 886.  As discussed above, the ALJ properly discounted or rejected Dr. Revesz's

17   opinions and plaintiff's testimony.  Because the ALJ's decisions were supported by substantial

18   evidence, and because the ALJ alone has the power to determine plaintiff's RFC, the ALJ's RFC

19   assessment was proper.

20               As a result, the hypothetical questions posed to the VE were also proper.  The ALJ

21   asked the VE whether an individual with the limitations included in plaintiff's RFC assessment

22   could perform any of the past work performed by plaintiff.  (AT 131-32.)  The VE responded that

23   sedentary skilled employment would be ideal and that the hypothetical individual could work as

24   an insurance underwriter or a customer call center supervisor.  (AT 132.)  The VE further

25   testified that although the cook position would not be suitable, the hypothetical individual could

26   work as an unskilled cashier in a restaurant.  (Id.)  The ALJ's RFC and subsequent hypothetical

25

1  to the VE adequately included all limitations supported by substantial evidence in the record.

2  Therefore, the ALJ properly determined that plaintiff is capable of performing past relevant work

3  as an insurance underwriter, customer service supervisor, and restaurant cashier.  Accordingly,

4  the ALJ's decision is free of legal error and is supported by substantial evidence in the record as

5  a whole.

6  V.    CONCLUSION

7          Based on the foregoing, IT IS HEREBY ORDERED that:

8          1.      Plaintiff's motion for summary judgment is denied;

9          2.      The Commissioner's cross-motion for summary judgment is granted; and

10         3.      The Clerk of the Court enter judgment in favor of the Commissioner.

11  DATED:  September 23, 2010

12

13

14

15  _____
    KENDALL J. NEWMAN
16  UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26